FAIRFIELD CREDIT CORPORATION *v.* JOHN E.
DONNELLY ET AL.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued October 8—decided December 9, 1969

*Frank J. McIntosh,* with whom, on the brief, was *Robin W. Waller,* for the appellants-appellees (defendants).

*William B. Rush,* with whom was *Grove W. Stoddard,* for the appellee-appellant (plaintiff).

KING, C. J.  This controversy arises out of a retail sales instalment contract providing for the sale of a color television set by D.W.M. Advertising, Inc. (hereinafter referred to as D.W.M.) to the defendants John E. and Mary E. Donnelly and D.W.M.'s assignment of its rights under that contract to the plaintiff, the Fairfield Credit Corporation.

In January, 1965, the defendants were approached by a friend who arranged for a salesman of D.W.M. to meet with the defendants.  Shortly thereafter, one of D.W.M.'s salesmen went to the defendants' home and discussed with them a plan whereby the defendants could "make extra money" by promoting the sale of color television sets for D.W.M.

After persuading the defendants to agree to enter into the plan, the salesman told them that in order to join the program they would have to sign a retail sales instalment contract, hereinafter referred to as the instalment contract, for the purchase of a television set from D.W.M. at a total price of $1210.95. The defendants would then be entitled to participate in a program whereby they would arrange for meet-

ings between salesmen of D.W.M. and potential customers. The defendants were to receive $50 for each person they referred who enrolled in the program, and, if a person so referred in turn enrolled another in the program, the defendants would receive an additional $50. This scheme is known in the trade as a "two-step referral system". In addition, the defendants were given three "Bonus Appointment Guarantees" each of which guaranteed that the defendants would receive $400 for each group of twenty names submitted of persons who would allow a presentation of the program by D.W.M., even though these people did not join in the program. The defendants also received a contract, hereinafter referred to as a service contract, wherein D.W.M. guaranteed the television set and agreed to supply all parts and labor necessary to maintain the television set for a period of one year beginning on the date of delivery, which was January 30, 1965.

The instalment contract consisted of a blank form provided to D.W.M. by the plaintiff, which D.W.M. filled out and had the defendants sign. The defendants filled out a credit application on a form supplied by the plaintiff. After an investigation, the plaintiff approved their credit and so notified D.W.M. Thereupon D.W.M. delivered the television set to the defendants and so notified the plaintiff. The plaintiff then called the defendant John E. Donnelly on the telephone, confirmed the fact that the set had been delivered, and ascertained from him that the television set was working properly. The plaintiff then accepted the assignment of the instalment contract.

The defendants made two payments to the plaintiff under the instalment contract and, on the advice

of their attorney, made no further payments. After the defendants ceased making payments, the plaintiff instituted suit as assignee of the instalment contract. The defendants pleaded a number of special defenses, including a breach of the service contract. The court found that the instalment contract was unconscionable as to sales price only and adjudged that the plaintiff recover only the reasonable value of the television set which, with financing charges, came to $941.85. From this judgment both the defendants and the plaintiff have appealed.

Because of the view we take of this case, only one of the defendants' special defenses need be considered, and that is the claim that D.W.M. breached the service contract and that this breach excused the defendants from further payments on the instalment contract.

The facts in the finding giving rise to the breach of the service contract are not attacked. The defendants were given the service contract at the time of delivery of the set. Three times within the two weeks following the delivery of the set it required service which was provided by D.W.M. When the set required further service, in March, 1965, however, the defendants were unable to get in touch with D.W.M. They did succeed in reaching the plaintiff but were told that it did not know how to reach D.W.M., and, although the defendants did reach "someone" from D.W.M. through the New Haven Better Business Bureau, they received no service and were unable to reach D.W.M. again. D.W.M. disappeared, and its corporate existence was dissolved the next year for failure to file its annual report. The plaintiff had discontinued financing D.W.M.'s contracts, and this in turn had caused D.W.M. to cease its selling operations in late Feb-

ruary or early March, 1965. Thereafter the defendants had the set repaired a number of times by a local repairman but finally abandoned attempting to use it. By that time the service contract had expired.

The trial court found the foregoing facts but concluded only that "[t]he defendants failed to prove their special defense as to the invalidity of the television service contract". The defendants' claim of breach of the service contract, however, was not a claim that the contract was invalid. Rather, the claim depends on the very validity of that contract since no one can breach an "invalid" contract. Thus, the meaning of the court's conclusion is unclear, but whatever the court had in mind, the only reasonable conclusion which can be reached on the foregoing subordinate facts in the finding was that D.W.M. breached the television service contract. Indeed there is no support in the facts as found for any other conclusion, and such a conclusion must be drawn as a matter of law.

The more difficult question and the question to which the parties especially direct their attention in the briefs is whether this breach by D.W.M. excuses the defendants from their obligation to make payments to the plaintiff on the instalment contract. The service contract, although contained in a separate writing, is not independent of the instalment contract. The parties did not assent to the two contracts separately but treated them as a single whole. See 6 Williston, Contracts (3d Ed.) § 863. The service contract was delivered with the television set and is supported by the same consideration as is the instalment contract, that is, the defendants' promise, made in the instalment contract, to pay $1210.95. The plaintiff had actual

knowledge of the existence of the service contract and makes no claim that it was misled by the fact that the service contract was not referred to in the instalment contract. D.W.M., had there been no assignment to the plaintiff, could not have enforced the instalment contract in the face of its material breach of the service contract, which, as already set forth, was inextricably connected with the instalment contract. *Automobile Ins. Co.* v. *Model Family Laundries, Inc.,* 133 Conn. 433, 437, 52 A.2d 137; *Pratt* v. *Dunlap,* 85 Conn. 180, 183, 82 A. 195. In other words, D.W.M. could not have prevailed in an action such as this to recover the unpaid balance of the contract price.

Ordinarily an assignee of a contract takes it subject to all defenses which might have been asserted against the assignor. General Statutes (Rev. to 1962) § 42a-9-318 (1) (a); *Bridgeport-City Trust Co.* v. *Niles-Bement-Pond Co.,* 128 Conn. 4, 10, 20 A.2d 91; *Mereness* v. *DeLemos,* 91 Conn. 651, 655, 101 A. 8; 4 Corbin, Contracts § 892. Thus, without more, there would be no question that the plaintiff would not be able to enforce this contract against the defendants.

The plaintiff claims, however, that it is not subject to any of the defenses which could have been asserted against D.W.M., including the breach of the service contract, because of the following language, in fine print, on the reverse side of the instalment contract: "The Buyer will settle all claims against the named Seller (the assignor) directly with such Seller and will not assert or use as a defense any such claim against the assignee."

Such a provision is generally referred to as a waiver of defense clause and is specifically dealt with in the Uniform Commercial Code in General

Statutes (Rev. to 1962) § 42a-9-206 (1), which provides that, "[s]ubject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under article 3. . . ."

The statute quoted above has specifically made effective a waiver of defense clause in favor of an assignee of a contract not involving a sale or lease of "consumer goods", as defined in General Statutes (Rev. to 1962) § 42a-9-109 (1). But the statute takes no position on whether such a clause constitutes a valid waiver by the buyer in a transaction involving consumer goods. Connecticut General Statutes Annotated (West Ed.) § 42a-9-206, comment 2, p. 434.

We see no reason why the plaintiff, in taking an assignment of a contract under the circumstances here, should be able to recover against the buyer where the seller could not. If a seller carries out his contract obligations, either he or the assignee can recover against the buyer for any default in performance on his part. The only purpose of a waiver of defense clause such as was used in this case is to give the assignee the status of a holder in due course of a negotiable instrument. In a few cases a provision has been inserted in a contract purporting in terms to make such an assignee a holder in due course. These cases are collected in an annotation in 79 A.L.R. 33 and Later Case Service.

While we have not heretofore had occasion to

consider the validity of such a waiver of defense clause, it has been the subject of judicial consideration in a number of states. The decisions have not been entirely in accord, but the cases are collected in § 25, page 162, of an annotation in 44 A.L.R.2d 8 and Later Case Service. We consider that the better rule is that set forth in cases such as *Unico* v. *Owen,* 50 N.J. 101, 124, 232 A.2d 405, which holds that such a clause in consumer-goods-conditional-sales contracts, chattel mortgages and other instruments of like character is void as against public policy.

In the first place, the use of a waiver of defense clause is an attempt to impart the attributes of negotiability to an otherwise nonnegotiable instrument. General Statutes (Rev. to 1962) § 42a-3-104. An attempt to evade the clear prerequisites of negotiability by the use of such clauses (often, as here, in fine print and couched in technical language the significance of which is difficult for the ordinary consumer to appreciate) is opposed to the policy and spirit of General Statutes (Rev. to 1962) § 42a-3-306, which provides that one not a holder in due course of an instrument is subject to all claims and defenses which would have been available against the original holder. See cases such as *Quality Finance Co.* v. *Hurley,* 337 Mass. 150, 155, 148 N.E.2d 385; *American National Bank* v. *A. G. Sommerville, Inc.,* 191 Cal. 364, 370, 216 P. 376.

In addition, since Connecticut's adoption of the Uniform Commercial Code in 1959, it has become increasingly clear that the policy of our state is to protect purchasers of consumer goods from the impositions of overreaching sellers. For example, the General Assembly, in its February, 1965 session, passed Public Act No. 350 (now General Statutes [Rev. to 1962] §§ 42-115c—42-115f), entitled "An

Act Concerning Consumer Frauds", which makes illegal certain deceptive trade practices and empowers the department of consumer protection to enforce the act. In 1967, the General Assembly authorized the creation of a "consumers advisory council" to assist the department of consumer protection in formulating standards for consumer goods. Public Acts 1967, No. 73 (now General Statutes [Rev. to 1968] § 19-170b). In that same session, an "Act Concerning Home Solicitation and Referral Sales", outlawing the referral system employed in this very case (Public Act No. 749 [now General Statutes (Rev. to 1962) §§ 42-134—42-143]), and an act concerning the disclosure of finance charges (Public Act No. 758 [now General Statutes (Rev. to 1962) §§ 36-348—36-363]) were passed, each of which was intended to provide extensive protection to the consumer. Finally, in the 1969 session of the General Assembly, no less than four acts were passed which were designed to afford protection to the consumer. Public Acts 1969, Nos. 13, 178, 325 and 454. There can be no question that there exists in Connecticut a very strong public policy in favor of protecting purchasers of consumer goods and that for a court to enforce a waiver of defense clause in a consumer-goods transaction would be contrary to that policy. See cases such as *Unico* v. *Owen,* 50 N.J. 101, 124, 232 A.2d 405; *Quality Finance Co.* v. *Hurley,* 337 Mass. 150, 154, 148 N.E.2d 385; *San Francisco Securities Corporation* v. *Phoenix Motor Co.,* 25 Ariz. 531, 540, 22 P. 229.

In its brief, the plaintiff asserts that the legislature has manifested its approval of waiver of defense clauses in General Statutes § 42-92, which provides that retail instalment contracts can be assigned according to the provisions of article 9 of

the Uniform Commercial Code. But as already pointed out, § 42a-9-206 of the General Statutes, which is a part of article 9, specifically takes no position on the validity of a waiver of defense clause in a consumer-goods transaction. We fail to see that by these statutes the legislature has manifested any such policy as the plaintiff claims. A Superior Court case on which the plaintiff seems to rely is *Hartford-Connecticut Trust Co.* v. *Clark-Barone Co.,* 21 Conn. Sup. 367, 370, 154 A.2d 883. That case is not in point. It was decided prior to our adoption of the Uniform Commercial Code, and it did not involve a sale of consumer goods. Thus the policy discussed was that applicable to commercial-business financing rather than to consumer-goods financing.

For the reasons hereinbefore pointed out, the plaintiff, as assignee of the instalment contract, stands in the shoes of its assignor, D.W.M., and has no greater rights of recovery in this action than D.W.M. would have had if there had been no assignment and D.W.M. had been the plaintiff.

The complaint in this action is based solely on the instalment contract, and the sole relief claimed is the balance owing under that contract. For the reasons hereinbefore stated, D.W.M. could not have recovered the balance owing under the instalment sales contract, and the plaintiff, as the assignee of D.W.M., is equally disabled from recovery of the balance owing under the contract.

The question of what relief, if any, D.W.M., and thus the plaintiff, as assignee, might have been entitled to had the complaint included a claim for damages based on the actual benefit conferred upon the defendants is not before us. See Restatement, Contracts § 357. The complaint contained no such claim, and, indeed, the plaintiff sought to exclude,

as immaterial, evidence which the defendants attempted to introduce as to the fair market value of the television set. See cases such as *Braithwaite v. Lee*, 125 Conn. 10, 13, 2 A.2d 380; *Unico v. Owen*, 50 N.J. 101, 126, 232 A.2d 405. In addition, of course, the issue in the instant case does not involve the question of ownership or possessory rights in the television set. Indeed, the record indicates no attempt by the plaintiff to repossess the set.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the defendants with costs.

In this opinion the other judges concurred.