SHORELINE COMMUNICATIONS, INC. *v.* NORWICH TAXI, LLC
(AC 21896)

Foti, Mihalakos and Peters, Js.

Argued February 19—officially released May 28, 2002

*Lloyd L. Langhammer*, with whom, on the brief, was *Amy M. Stone*, for the appellant (defendant).

*James F. Spallone*, for the appellee (plaintiff).

*Opinion*

PETERS, J. This appeal concerns the rights of an assignee to terminate a license agreement when it discovers, after the assignment, that it had been mistaken in its assumption that the licensed property would suit its commercial needs. The trial court held that the assignee had assumed the risk of its unilateral mistake because it had failed to inspect the licensor's premises before assuming the license agreement. Having assumed the risk, the assignee was obligated to pay license fees during the unexpired term of the license agreement. We agree and affirm the judgment of the trial court.

The plaintiff, Shoreline Communications, Inc., the owner of a radio communications tower, sued the defendant, Norwich Taxi, LLC, to recover unpaid license fees due under a license agreement with the defendant's assignor, Eagle Cab Corporation (Eagle). Eagle had assigned its contractual rights to use space on the tower to the defendant, which unconditionally assumed Eagle's obligations to the plaintiff. The defendant declined to pay the license fees once it became evident that, contrary to its expectations, its equipment could not make profitable use of the tower space. Characterizing the defendant's disappointment as a unilat-

eral mistake, the court held that the defendant's mistake did not authorize its unilateral rescission of the license agreement.[1] Accordingly, the court rendered judgment in favor of the plaintiff, awarding it damages in the amount of $12,600 for the unpaid license fees, as well as interest of $273.92 and costs. The defendant has appealed.

The trial court's memorandum of decision recites the relevant facts, which are undisputed. On October 30, 1997, the plaintiff and Eagle entered into a five year license agreement that enabled Eagle to use its radio equipment at a designated space on the plaintiff's radio transmission tower in order to pursue its taxicab business. The license agreement granted Eagle the right to use the space without restriction to any particular usage. In return, Eagle undertook to pay stipulated monthly payments to the plaintiff. Eagle encountered no problems in its use of the transmission tower and promptly made license payments as they became due.

On May 20, 1999, Eagle assigned the license agreement to the defendant. Without reserving any additional rights, the defendant informed the plaintiff that it had assumed the rights and obligations stated in the

---

[1] The defendant filed a denial and seven special defenses. This appeal is limited to questions of mistake. The defendant's sixth and seventh special defenses alleged that the defendant never used the plaintiff's facilities or its equipment. The court addressed these defenses as part of its discussion of the law of mistake.

None of the other defenses is before us in this appeal. The defendant has not appealed from the court's rulings that, contrary to the defendant's first and second special defenses, the text of the license agreement did not preclude the plaintiff from pursuing a claim for damages. The court also held, contrary to the defendant's third special defense, that the plaintiff had pleaded a claim for which relief could be granted.

The defendant apparently abandoned, at trial, its fourth special defense that alleged the absence of valid consideration for the defendant's assumption of the license agreement. It similarly abandoned the seventh special defense alleging fraudulent concealment by the defendant's assignor.

license agreement. As assignee, it made payments to the plaintiff until the end of October of that year.

Between May, 1999, and October, 1999, the defendant made a good faith effort to install its radio equipment on the plaintiff's tower. Because Eagle's installation had encountered no difficulties, the defendant had not anticipated that its own installation would be problematic.

At the time of the assignment, the defendant did not know whether it could use Eagle's equipment but it did know that its own taxicab service differed from Eagle's because its service area was wider and its business was conducted at a location further away from the plaintiff's tower. Despite this uncertainty, the defendant unconditionally assumed the rights and duties set out in the license agreement. From May to October, 1999, the defendant attempted, unsuccessfully, to use the tower space. It discovered that its use of the plaintiff's tower space would have required the services of two different telephone companies, with unacceptable uncertainties about prompt detection and remediation of transmission failures.

When these facts came to light, the defendant informed the plaintiff that the licensing agreement was terminated. The plaintiff promptly replied that the defendant had no right to terminate the agreement unilaterally. The plaintiff reminded the defendant of the provision of the agreement that required the payment of license fees until the expiration of the agreement on October 31, 2002. It demanded prompt payment of the fees already overdue. Nevertheless, the defendant stopped making payments as of November 1, 1999.

At the time when the defendant assumed liability under the licensing agreement, it had taken no steps to ascertain whether installation of its equipment would be feasible. The defendant assumed that Eagle's favor-

able experience with Eagle's equipment would carry over to the defendant's own operations. Despite known differences between its business operations and that of Eagle, the defendant did not avail itself of the opportunity to arrange for a preassignment inspection of the tower space.[2]

On the basis of these findings of fact, the court concluded that, as a matter of law, the defendant had failed to establish that its mistaken assumptions entitled it to terminate the license agreement without the assent of the plaintiff. Relying on 1 Restatement (Second), Contracts §§ 153 and 154, pp. 394, 402 (1981),[3] the court held that the defendant had assumed the risk of a misfit between the plaintiff's tower space and the defendant's equipment. It had assumed that risk, the court held, because prior to becoming Eagle's assignee, it had relied on Eagle's experience without ascertaining whether its own greater needs might encounter difficulties that Eagle had not experienced.

The defendant challenges the court's conclusion on three grounds. Conceding that it made a unilateral mistake, the defendant maintains that the mistake termi-

---

[2] There is no suggestion in the record that the defendant was in any way precluded from making the relevant inquiries. Neither is there any suggestion that consummation of the assignment was so urgent that the defendant had no time to have testing done.

[3] 1 Restatement (Second), supra, § 153, p. 394, provides: "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him *if he does not bear the risk of the mistake under the rule stated in § 154,* and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake." (Emphasis added.)

1 Restatement (Second), supra, § 154, pp. 402–403, provides in relevant part: "A party bears the risk of a mistake when . . . (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ."

nated the licensing agreement because (1) it did not bear the risk of that mistake, (2) enforcement of an agreement that is of no benefit to the defendant is unconscionable and (3) prompt repudiation of the agreement did not injure the plaintiff because it could be restored to the rights it had before the assignment.

Because the claims that the defendant has raised challenge the trial court's conclusions of law, our review is plenary. See *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 598, 790 A.2d 1178 (2002); *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000); *Hunnicutt* v. *Commissioner of Correction*, 67 Conn. App. 65, 68, 787 A.2d 22 (2001). We conclude that none of these claims is persuasive.

I

THE RISK OF UNILATERAL MISTAKE

The defendant argues that it falls within various exceptions to the general rule that a unilateral mistake is not a viable basis for rescission of a bilateral contract. The defendant maintains that it did not assume the risk of incompatibility between its equipment and the plaintiff's tower because it had no reason to expect any such incompatibility and, therefore, was acting in good faith when it delayed its inquiry into such matters to a time subsequent to the assignment. We do not agree that, under the circumstances of this case, the defendant was entitled unilaterally to set aside its contract obligation to pay license fees.

As the trial court noted, the principles governing the law of mistake are set out in 1 Restatement (Second), supra, §§ 153 and 154. Under § 153, a unilateral mistake may make a contract voidable if the mistaken party "does not bear the risk of the mistake under the rule stated in § 154 . . . ." 1 Restatement (Second), supra,

§ 153, p. 394. Under § 154, "A party bears the risk of a mistake when . . . (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ." 1 Restatement (Second), supra, § 154, pp. 402–403.

The court, in its careful and comprehensive memorandum of decision, concluded that the defendant bore the risk of its unilateral mistake because, when it assumed the licensing agreement, it was aware of significant differences between its own planned operations and that of Eagle. Relying on § 154 of the Restatement (Second) of Contracts, the court held that, because of this awareness, the defendant bore the risk of mistake when it nonetheless undertook to become an assignee, without conditioning its assigned duties in any way.

The defendant argues, to the contrary, that its knowledge of these differences was insufficient to assign the risk of loss to it because, relying on Eagle's favorable experience, it was entitled to assume that its operations would likewise be able to make use of the plaintiff's tower site. The defendant maintains that it did not have the kind of "limited knowledge" that would require it to bear the risk of its mistake. It was not, therefore, "consciously" aware of treating "[its] limited knowledge as sufficient . . . ."

One difficulty with the defendant's view of the law of mistake is that its argument rests entirely on the defendant's subjective state of mind at the time of the assignment. The defendant concedes that its position finds no support in the terms of the license agreement. The agreement did not make a licensee's obligation to pay license fees contingent on the licensee's ability to make profitable use of the designated space on the plaintiff's radio tower. Neither in writing nor orally did

the plaintiff undertake *any* contractual obligation other than to make tower space available.

Apart from the agreement, the plaintiff had no reason to anticipate an assignment of any kind and consequently had no reason to anticipate the difficulties that an assignee might encounter. The plaintiff's operations bore no resemblance to a business such as the construction business, in which unilateral mistakes are known to occur as a result of the pressure of last minute preparation of competitive bids. See, e.g., *Geremia* v. *Boyarsky*, 107 Conn. 387, 388–89, 140 A. 749 (1928); *Regional School District No. 4* v. *United Pacific Ins. Co.*, 4 Conn. App. 175, 182, 493 A.2d 895, cert. denied, 196 Conn. 813, 494 A.2d 907 (1985); *Drennan* v. *Star Paving Co.*, 51 Cal. 2d 409, 333 P.2d 757 (1958). In short, the plaintiff did not contribute to the defendant's mistake in any way.

The record does not show that the defendant revealed to anyone, in advance of the assignment, that it had specific expectations about its use of the tower space.[4] Negation of a contract obligation in these circumstances would place a risk on the plaintiff that the plaintiff could have neither foreseen nor avoided. It is the rare case in which contract rights are so ephemeral.[5] "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the con-

---

[4] This failure of communication does not mean that the defendant did not, in fact, have preassignment expectations. The trial court made no such finding.

[5] Such cases arise under the law of impossibility or frustration of purpose. See 2 Restatement (Second), Contracts § 266, pp. 338–39 (1981). The defendant has not raised any such issue in this case.

tract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000); *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 357, 727 A.2d 1260 (1999); *John M. Glover Agency* v. *RDB Building, LLC*, 60 Conn. App. 640, 644–45, 760 A.2d 980 (2000).

A second difficulty with the defendant's position is that the proven facts demonstrate that the defendant assumed the risk of its unilateral mistake as that risk is defined in § 154 of the Restatement. Before the assignment, the defendant knew that its use of the tower space would differ from that of Eagle because the defendant's taxicab business covered a larger geographical area and was located farther away from the tower. It did not ascertain whether Eagle's equipment would be suitable for its own needs. It made no effort to determine the suitability of the plaintiff's tower space. The defendant could as readily have discovered possible problems before the assignment as after the assignment. The defendant cannot avoid its contractual obligation when it could have taken steps to check out the accuracy of its expectations.

The defendant has not brought to our attention any case that would permit the defendant to avoid contractual liability under the circumstances of this case. The out-of-state authorities that it cites are readily distinguishable.

*Harley* v. *Magnolia Petroleum Co.*, 378 Ill. 19, 37 N.E.2d 760 (1941), is a case of mutual mistake, not unilateral mistake. The question was whether *both* parties understood that their agreement failed to express their *common* understanding. Id., 28. That question is far removed from the present controversy.

*Bentley* v. *Slavik*, 663 F. Sup. 736 (S.D. Ill. 1987), is a case in which the seller of a violin warranted, in writing, that the instrument had a specified provenance. Although the purchaser briefly played the violin before the purchase, it was not until the purchaser had played the violin for a more extended period of time, after the purchase, that she began to doubt that the violin was what it had been warranted to be. Because the defendant in the present case has never claimed that the plaintiff made any such warranty, *Bentley* is irrelevant.

*Knudsen* v. *Jensen*, 521 N.W.2d 415 (S.D. 1994), is a case of a contract for the sale of a house. The buyers had inspected the house before the closing, but their inspection had not revealed serious structural problems. The court permitted rescission of the contract on the ground that the latent defect in the house could not have been discovered by a reasonable inspection. Id., 419. In the present case, the lack of a proper fit between the tower space and the defendant's equipment *could* have been discovered by a site inspection, as is demonstrated by the speedy discovery of technical obstacles after the assumption of the license agreement. Even more important, the tower space that the defendant hoped to utilize was not defective. It did not become defective just because the defendant found it to be unsuitable for its own uncommunicated needs.[6]

On the basis of the facts found by the trial court and the law that it correctly stated and applied, we conclude that the defendant has not established that it was excused from the consequences of its unilateral mistake. Contrary to its arguments, we conclude that it bore the risk of loss attributable to its mistake.

---

[6] Unlike the arguments made in *Knudsen*, this case does not address the role of negligence in the law of unilateral mistake. At trial, there was neither an allegation nor a finding that the defendant had been negligent. The defendant's reliance on 1 Restatement (Second), supra, § 157, is therefore misguided.

## II

## UNCONSCIONABILITY

The defendant further argues that, even if it bore the risk of mistake, enforcement of the license agreement would be unconscionable because it should not be required to pay for space that it cannot use. We disagree.[7]

The text of the Restatement does not support the defendant's argument. Although § 153 speaks of unconscionability, that provision applies only in the absence of an assumption of risk by the party that has made a unilateral mistake.[8]

As a general matter, we know of no case, and the defendant has cited none, in which a party may invoke unconscionability without a showing of some kind of relevant misconduct by the party seeking enforcement of a contract. The usual case concerns the liability of a consumer who assumed unexpectedly onerous contract obligations that were not fully disclosed by a commercial seller. See, e.g., *Mack Financial Corp.* v. *Crossley*, 209 Conn. 163, 550 A.2d 303 (1988); *Barco Auto Leasing Corp.* v. *House*, 202 Conn. 106, 520 A.2d 162 (1987); *Family Financial Services, Inc.* v. *Spencer*, 41 Conn. App. 754, 677 A.2d 479 (1996).

Many of the unconscionability cases arise in the context of some kind of misleading conduct that comes close to being fraudulent. Under the law of procedural unconscionability, such contracts may be voidable by an innocent party who has been misled about the advisability of entering into a contract. See 1 Restatement (Second), supra, § 153; see also General Statutes § 42a-

---

[7] This issue was raised in the trial court although the court chose not to address it because of its conclusion that the defendant bore the risk of loss.

[8] See footnote 3.

2-302; A. Leff, "Unconsionability and the Code—The Emperor's New Clause," 115 U. Pa. L. Rev. 485 (1964).

The defendant does not claim that its duty to pay licensee fees should be set aside because the plaintiff engaged in misleading conduct. Instead, the defendant maintains that the license agreement should be set aside on the ground of substantive unconscionability. The leasing agreement is substantively unconscionable, according to the defendant, because of a "gross disparity in the values exchanged" by the parties. The defendant argues that it should not have to pay for tower space that is useless.

The defendant's argument is unpersuasive for two reasons. The defendant fails to distinguish between personal lack of utility and general lack of utility. It fails to explain why an assignee has rights of termination that are greater than those of its assignor.

It is important to restate that the tower space is not defective or valueless. It had value for some licensees, such as Eagle, and not for others, such as the defendant. So long as the plaintiff did not undertake to warrant the suitability of the tower space, it is inaccurate to describe the tower space as useless.

Further, it bears remembering that the defendant's rights and obligations are derived from those undertaken by Eagle. The licensing agreement was fully enforceable before the assignment. There was no novation or modification of the license agreement. The defendant does not allege that Eagle, the assignor, had any right to terminate the agreement before expiration of its five year term. Eagle successfully made use of its assigned space on the plaintiff's tower. Eagle never made a unilateral mistake of any kind. In effect, the defendant asserts that, because its equipment differs from that of Eagle, it has a greater right to terminate than Eagle had.

The defendant nonetheless claims the right to add a new condition to the license agreement to accommodate its own uncommunicated needs. It is hornbook law, however, that an assignee "stands in the shoes of the assignor." (Internal quotation marks omitted.) *Rumbin* v. *Utica Mutual Ins. Co.*, 254 Conn. 259, 277, 757 A.2d 526 (2000); *National Loan Investors Ltd. Partnership* v. *Heritage Square Associates*, 54 Conn. App. 67, 73, 733 A.2d 876 (1999); 3 E. Farnsworth, Contracts (1998) § 11.8, pp. 105–107; 3 S. Williston, Contracts (3d Ed. 1960) § 404, p. 5, and § 432, pp. 181–83. An assignee has no greater rights or immunities than the assignor would have had if there had been no assignment. *Fairfield Credit Corp.* v. *Donnelly*, 158 Conn. 543, 552, 264 A.2d 547 (1969).

We can find no support for the proposition that, by dint of an assignment, an enforceable agreement has become unconscionable. To the contrary, it would be unreasonable to allow an assignment to deprive the plaintiff of its unconditional contractual right to license payments. The terms of the leasing agreement did not change. The plaintiff did not solicit the assignment. Standing in the shoes of the assignor, the defendant had no authority to rewrite the contract for which it has assumed full responsibility.

We are not persuaded that the defendant was empowered, as a result of its own mistake, to change absolute contractual obligations into provisional contract obligations. Contrary to the defendant's argument, this case does not exemplify a "gross disparity in the values exchanged by the parties."

In its argument for "gross disparity," the defendant underscores the cost of making license payments for space that, for its purposes, has no value. That cost must, however, be compared to the cost to the plaintiff

if it does not receive such payments, because that is the other side of the equation.

The trial court analyzed the consequences to the plaintiff of failing to receive license fees. In its discussion of the plaintiff's right to damages, the court considered whether such damages should be reduced as a result of the plaintiff's failure to search for other users for the defendant's tower site. The court concluded that such a reduction would be inappropriate because the plaintiff's tower had many vacant spaces. The defendant's nonpayment would not give the plaintiff the opportunity to profit from a new license agreement of the defendant's tower space. See *Neri* v. *Retail Marine Corp.*, 30 N.Y.2d 393, 399–400, 285 N.E.2d 311 (1972); 3 Restatement (Second), Contracts § 347, comment (f), p. 117 (1981); J. Calamari & J. Perillo, Contracts (4th Ed. 1998) § 14.16, p. 565. In this appeal, the defendant has not challenged the validity of the court's analysis.

It follows from the court's conclusion that, in the event of nonpayment by the defendant, the plaintiff cannot be made whole. It cannot be restored to its situation before the leasing agreement unless it has forfeited its rights to payment because of the defendant's mistake. Put differently, the question of "gross disparity" devolves into the question of whether the innocent plaintiff or the mistaken defendant should be $12,600 out of pocket. It would turn contract principles on their head to put this burden on the plaintiff when, as we have decided earlier in this opinion, the defendant bore the risk of its mistake.

We conclude, therefore, that enforcing the licensing agreement is not unconscionable. Two commercial parties, presumably with access to attorneys, entered into an agreement that the plaintiff has honored fully. There is nothing inherently unfair in an agreement that unambiguously and unconditionally requires one of the par-

ties to assume the risk that its use of the licensed space might be unprofitable. If such an agreement, in retrospect, seems harsh to the defendant, the defendant could have refused to become an assignee. Having undertaken the assignment without discussion with the plaintiff and without inspection of the tower site, the defendant cannot rely on a defense of unconscionability.

## III

## CONSEQUENCES OF A RESCISSION

Underlying the defendant's final argument for rescission is that, even if it bore the risk of unilateral mistake, its mistake was the result of good faith expectations and therefore gave it an equitable claim, apart from unconscionability, to rescind its obligations under the license agreement. We disagree with this argument as well.

Part of the defendant's claim is its contention that the agreement is rescindable because the plaintiff can be returned to the contractual rights that it had before the assignment. We have already addressed and rejected that contention. In *Milford Yacht Realty Co.* v. *Milford Yacht Club, Inc.*, 136 Conn. 544, 549, 72 A.2d 482 (1950), our Supreme Court held that "[a] court of equity is always reluctant to rescind, unless the parties can be put back in *statu quo*. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it." (Emphasis in original; internal quotation marks omitted.)

The other part of the defendant's claim is that rescission is proper because the plaintiff's rights are adequately protected by the fact that the plaintiff can seek recovery from Eagle. The defendant correctly notes that, as a matter of law, an assignor's obligations are not extinguished by an assignment. Despite Eagle's

assignment of its contract rights and duties to the defendant, Eagle could not and did not unilaterally discharge its duties to pay license fees to the plaintiff. "When a duty is delegated . . . the delegating party . . . continues to remain liable. . . . [Delegation] does not free the obligor . . . from [its] duty to see to it that performance is rendered, unless there is a novation." (Internal quotation marks omitted.) *Gateway Co.* v. *DiNoia,* 232 Conn. 223, 233, 654 A.2d 342 (1994), citing J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 18-25, p. 757; cf. *Carrano* v. *Shoor,* 118 Conn. 86, 95–98, 171 A. 17 (1934). There was neither an allegation nor a finding that the assignment constituted a novation that would have relieved Eagle from liability.

As a matter of fact, however, a judgment against Eagle would likely be unenforceable. As the defendant acknowledges in the opening paragraph of its appellate brief, it "bought the assets of Eagle Cab." There is no suggestion in the record that Eagle ever acquired other assets or, for that matter, that it stayed in business.

It is anomalous that a party seeking equitable relief from the consequences of its own mistake should seek to justify its failure to make license payments by pointing the innocent party to an alternate source of relief that is illusory. As far as the record shows, Eagle no longer exists.

The defendant, therefore, has no right to rescind the licensing agreement. It has not made a persuasive case that "the clearest and strongest equity imperatively demands" such a rescission. The defendant must fulfill the obligations that it assumed when it became an assignee of the licensing agreement.

The judgment is affirmed.

In this opinion the other judges concurred.