## LAURA ANN KRACK *v.* ACTION MOTORS CORPORATION
## (AC 24876)

Dranginis, McLachlan and Stoughton, Js.

Argued November 15, 2004—officially released March 1, 2005

*Neal P. Rogan,* with whom, on the brief, were *Joseph DaSilva* and *Marc J. Grenier,* for the appellant (defendant).

*Richard F. Wareing,* with whom, on the brief, was *Daniel S. Blinn,* for the appellee (plaintiff).

*Opinion*

McLACHLAN, J. The novel issue in this appeal is whether a dealer that sells used automobiles breaches the implied warranty of merchantability[1] when it innocently sells a vehicle with a salvage history, charging the buyer the price of a nonsalvaged used vehicle. We conclude that General Statutes § 42a-2-314 places the risk of loss associated with such an occurrence squarely

---

[1] General Statutes § 42a-2-314 (2), which is identical to § 2-314 (2) of the Uniform Commercial Code, provides in relevant part: "Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description . . . ."

The parties' contract described the salvaged vehicle at issue as "used." The court found, and the defendant does not challenge on appeal, that a salvaged vehicle cannot pass without objection as a used vehicle.

on the seller and, accordingly, respond in the affirmative.

When the plaintiff, Laura Ann Krack, realized that the defendant, Action Motors Corporation of Danbury, had sold her a salvaged vehicle without her knowledge, she sued, pro se, in the small claims session of the Superior Court. The defendant transferred the case to the regular civil docket pursuant to Practice Book § 24-21, and the plaintiff, who hired an attorney, prevailed. What began as a small claims matter limited to $3500 in damages ultimately was transferred to the complex litigation docket of the Superior Court, and resulted in awards of $9715.10 in damages[2] and $38,626 in costs and attorney's fees after trial to the court. The defendant claims on appeal that the court (1) improperly concluded that the defendant had breached the implied warranty of merchantability and (2) abused its discretion in awarding unreasonably high attorney's fees. We affirm the judgment of the trial court.

Following the transfer to the regular civil docket, the plaintiff filed an amended, three count complaint alleging a breach of the implied warranty of merchantability, and violations of the Magnuson-Moss Warranty-Federal Trade Commission Act[3] and the Connecticut Unfair Trade Practices Act (CUTPA).[4] The matter was tried to the court, which found in the plaintiff's favor as to the first two counts and in the defendant's favor as to the CUTPA count.[5] In its memorandum of decision,

---

[2] The court awarded $9668 in expectation damages and $47.10 in consequential damages. See General Statutes § 42a-2-714 (2) and (3).

[3] See 15 U.S.C. §§ 2301 through 2312 (2000). The court's finding in the plaintiff's favor under that theory was duplicative of its finding under the implied warranty of merchantability and, as such, we do not discuss the substantive provisions of the Magnuson-Moss Warranty-Federal Trade Commission Act in this opinion.

[4] See General Statutes § 42-110a et seq.

[5] The plaintiff alleged in the CUTPA count of her complaint that the defendant had "actual knowledge" of the vehicle's salvage history, but was unable to prove that fact.

the court made the following relevant findings of fact. "On February 23, 1999, the plaintiff purchased a 1994 General Motors Corporation Suburban station wagon from the defendant for $19,688. The defendant disclosed in the purchase contract that the vehicle had previously been driven 73,610 miles. . . . Unbeknownst to the plaintiff, an insurance company had acquired the Suburban in Illinois as a salvage vehicle.[6] At the time, the car had been driven 47,902 miles. The car was rebuilt and a salvage title [was] issued to it. An automobile dealer in New York then purchased the car and sold it to an individual in New Jersey. The state of New Jersey deleted or 'washed' the salvage history of the car and issued a clean title. The New Jersey owner sold the car to a New York resident in 1997, and the state of New York issued another clean title. The New York owner sold the car to the defendant in early February, 1999.

"The defendant's policy is not to sell vehicles that it knows have branded, salvaged or otherwise infirm titles. In this case, the defendant had no actual knowledge that the car had been salvaged. As a general rule, the defendant would have its finance department review the title documents of any vehicle it obtains. The title conveyed to the defendant by the New York owner for the Suburban was clean. Two people working for or contracted by the defendant appraised the car. There were no problems with the body work or painting, or any other evidence during the appraisal process, that gave the appraisers any indication of the car's salvage history. . . .

"In August, 2001, the plaintiff brought the car for servicing to a General Motors Corporation dealer in

---

[6] The court stated in its memorandum of decision: "Although there was testimony that a car can become branded as a salvage vehicle for a variety of reasons, such as damage from an accident or because it was stolen, there was no evidence concerning the precise reason why the car in this case became a salvage vehicle."

New York in response to a General Motors Corporation service bulletin. Apparently because of the vehicle's blemished title, the New York dealer would not cover the $47.10 charge for maintenance. It was as a result of this incident that the plaintiff first learned of the car's salvage history. . . . Although the car has run well, as a salvaged vehicle it has a stigma attached to it because subsequent purchasers would not know the reason for its salvage history. This stigma diminishes its fair market value. Generally, the fact that a car has a salvage history, without more, reduces its value by 50 percent. The reasonable fair market value at the time of purchase for the vehicle in this case was $10,000."

I

The defendant claims that its innocent[7] sale of a salvaged vehicle to the plaintiff could not have constituted a breach of the implied warranty of merchantability because the plaintiff did not prove that the defendant was at fault in failing to discover the salvage history. Whether a plaintiff must prove fault in order to prevail in an action for a breach of the implied warranty of merchantability is an issue that has never been squarely decided by an appellate court of this state. It is a question of law over which our review is plenary. See, e.g., *Gilbert* v. *Beaver Dam Assn. of Stratford, Inc.*, 85 Conn. App. 663, 672, 858 A.2d 860 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

In *Prishwalko* v. *Bob Thomas Ford, Inc.*, 33 Conn. App. 575, 636 A.2d 1383 (1994), this court stated: "In Connecticut, strict liability for innocent misrepresentation in the sale of goods is well established." (Internal quotation marks omitted.) Id., 588. Although the defen-

---

[7] Because we conclude that the defendant's fault is irrelevant to whether it breached the implied warranty of merchantability, we may assume without deciding that the defendant did everything reasonably appropriate in examining the vehicle's title history.

dant correctly distinguishes *Prishwalko* as a case involving an express rather than an implied warranty, the defendant ends its examination of the issue there, failing to support its claim that the implied warranty of merchantability ought to be regarded differently in that respect from an express warranty. The authorities on the subject do not support the defendant's claim. To the contrary, it is clear that the purpose of the implied warranty of merchantability is not to assign blame, but to assign risk and that, accordingly, fault is not an element of the plaintiff's case for breach of that warranty.

"[Uniform Commercial Code] § 2-314 imposes warranty liability for the protection of buyers. The purpose behind . . . § 2-314 is to hold a merchant seller responsible when inferior goods are passed along to an unsuspecting buyer. Thus, whether or not the defects could, or should, have been discovered by the merchant seller, the merchant seller is liable to the buyer whenever the goods are not, at the time of delivery, of a merchantable quality . . . . The Uniform Commercial Code is designed to protect the buyer from bearing the burden of loss where merchandise does not live up to normal commercial expectations . . . ." 3 L. Lawrence, Anderson on the Uniform Commercial Code (3d Ed. 2002) § 2-314:5. "The effort has been made by some to force warranty liability into the category of liability based on fault. This effort is misguided. In the case of the implied warranty of merchantability, there is liability without fault. Although the goods must be nonconforming [for a breach to occur], no distinction is made in terms of the 'fault' of the defendant. The implied warranty of merchantability is breached whether or not the seller could have prevented the nonconformity. . . . The only practical and logical conclusion is that the warrantor is made liable, although free from moral or personal fault, because society for one reason or another wants to place the burden of harm resulting from nonconform-

ing products upon the warrantor rather than upon the buyer . . . ." Id., § 2-314:11; see also 1 J. White & R. Summers, Uniform Commercial Code (4th Ed. 1995) § 9-7, pp. 510–11 (listing elements required to prove breach of implied warranty of merchantability without mention of fault or negligence on part of seller); cf. *Schenck* v. *Pelkey*, 176 Conn. 245, 254–55, 405 A.2d 665 (1978) (noting similarities between strict liability for sale of unreasonably dangerous products and implied warranty of merchantability). We note, finally, that Connecticut's long history of a "very strong public policy in favor of protecting purchasers of consumer goods"; *Fairfield Credit Corp.* v. *Donnelly*, 158 Conn. 543, 551, 264 A.2d 547 (1969); is in line with the national authorities on the Uniform Commercial Code.

The defendant argues that this decision places on automobile dealers the additional onerous burden of researching the history of facially clean titles, which is in contravention of General Statutes § 14-174 (d). In so arguing, the defendant injects the language of the law of negligence into a situation in which it has no place. In fact, we do not hold that the defendant was negligent in failing to research the title for a history of salvage. See footnote 7. Instead, we hold that the defendant seller rather than the plaintiff buyer bore the risk that the vehicle was salvaged. Section 14-174 (d) does not, as the defendant claims, conflict with our holding today. It provides in relevant part: "A certificate of title issued by the commissioner [of motor vehicles] is prima facie evidence of the facts appearing on it. . . ." The defendant essentially asks us to interpret that subsection to mean that it can rely on the nonexistence of all facts *not* appearing on the title. That is not a logical reading of the statute.[8] The title at issue contained no affirmative

---

[8] We note that the second sentence of General Statutes § 14-174 (d), which provides that "[i]n any criminal proceeding, a certified copy of a certificate of title shall be prima facie evidence as to the ownership of a motor vehicle," betrays its purpose as part of the legislature's effort to combat the traffic

representations as to whether the vehicle had a salvage history. Most importantly, in light of the no-fault liability imposed by § 42a-2-314, the appropriateness of the defendant's reliance on the certificate of title is irrelevant.[9] We accordingly conclude that fault is not an element of a plaintiff's case under the implied warranty of merchantability. See General Statutes § 42a-2-314.

II

We next consider whether the court's award of attorney's fees was reasonable.[10] The defendant claims that the court's award was "arbitrary and capricious and constitute[d] an impermissible penalty on the defendant for exercising its right to remove the case to the regular docket of the Superior Court." We disagree.

We review the award of attorney's fees for a clear abuse of discretion. "Whether any award is to be made and the amount thereof lie within the discretion of the trial court, which is in the best position to evaluate the particular circumstances of a case. . . . A court has few duties of a more delicate nature than that of fixing counsel fees. The issue grows even more delicate on appeal; we may not alter an award of attorney's fees unless the trial court has clearly abused its discretion

in stolen vehicles and not to protect used automobile dealers from the possibility that they will unwittingly sell a salvaged vehicle.

[9] The defendant's claim that the plaintiff's failure to allege an "innocent misrepresentation" was a material variance from the counts pleaded is wholly without merit. The plaintiff alleged a breach of the implied warranty of merchantability, which, as a matter of law, includes innocent misrepresentations.

[10] The court awarded attorney's fees and costs pursuant to General Statutes § 52-251a, Practice Book § 13-25 and 15 U.S.C. § 2310 (d). Because the award would be duplicated under those provisions, we need only address § 52-251a, on which the court primarily relied as statutory authority for its award. Section 52-251a provides: "Whenever the plaintiff prevails in a small claims matter which was transferred to the regular docket in the Superior Court on the motion of the defendant, the court may allow to the plaintiff his costs, together with reasonable attorney's fees to be taxed by the court."

. . . ." (Citation omitted; internal quotation marks omitted.) *LaMontagne* v. *Musano, Inc.*, 61 Conn. App. 60, 63–64, 762 A.2d 508 (2000). The factors a court normally applies in determining a reasonable attorney's fee include "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." (Internal quotation marks omitted.) *Jacques All Trades Corp.* v. *Brown*, 57 Conn. App. 189, 198, 752 A.2d 1098 (2000); see also Rules of Professional Conduct 1.5. That list of factors is not, however, exclusive. The court may "assess the reasonableness of the fees requested using any number of factors . . . ." *Smith* v. *Snyder*, 267 Conn. 456, 480, 839 A.2d 589 (2004).

Following trial, the court criticized the defendant for, inter alia, making the tactical decision to transfer the case to the regular docket, which would prolong and complicate the issues. The court was also particularly critical of the defendant for refusing to settle or to acknowledge the vehicle's salvage history, for giving evasive answers to the plaintiff's requests for admissions and for utilizing its superior economic resources to gain an advantage over the plaintiff. The court stated: "The defendant's move [transferring the case from the small claims session] has backfired. In a court of law, might does not make right. Now that the court has declared the defendant responsible for the plaintiff's damages, the defendant must pay for the consequences

of its improvident denial of responsibility. Those consequences, as a matter of logic, fairness and statutory authorization, are the plaintiff's attorney's fees and costs." The court awarded the plaintiff $38,626 in attorney's fees, nearly all of the amount that the plaintiff's counsel requested,[11] subtracting only the costs attributable to a junior attorney who assisted the plaintiff's counsel during the trial.[12] The court acknowledged the discrepancy between the damages awarded on the merits and the attorney's fees, explaining that there were significant start-up costs associated with litigation and that the defendant's unreasonable, win at all costs behavior drove up the amount of time the plaintiff's counsel had to spend and, consequently, the costs. The court stated that this case "provide[d] a perfect justification for [General Statutes § 52-251a]."[13] The defendant claims that the court's unwarranted animosity was the driving force behind its excessive award of attorney's fees and that it actually was the *plaintiff* who unreasonably adopted a win at all costs attitude and never considered the resources being expended relative to the potential recovery.

The court mentioned its consideration of the enumerated reasonableness factors, but did not give a full explanation of its process in applying them. The defendant claims that this necessarily indicates that the court did not, in fact, even apply the factors. We, on the other hand, believe that the court, within its broad discretion, could have applied the relevant factors, enumerated and otherwise, and reached the result that it did. The court was in the best position to weigh the factors and

---

[11] The plaintiff's counsel testified at a hearing and submitted an affidavit and billing statement in which he disclosed the number of hours billed and the bases for the rates charged. He requested fees in the amount of $39,763.50.

[12] The plaintiff's counsel had, on his own, subtracted a substantial number of billed hours from his request for fees, including all time attributable solely to the unsuccessful CUTPA claim.

[13] See footnote 10.

the parties' competing arguments. Weighing heavily in favor of the court's award are the deterrent purpose behind § 52-251a, the defendant's unreasonable behavior after transferring the case from the small claims docket and the undesirability to attorneys of similar consumer cases.

The applicability of § 52-251a distinguishes this case from others in which the particular award of attorney's fees at issue might be questionable. The very purpose of § 52-251a is to deter similarly situated defendants from transferring a case from the small claims session and turning a relatively clear-cut case into a pitched legal battle. The defendant claims that the court's award was punitive, and that is not entirely untrue. As stated by our Supreme Court: "Section 52-251a thus creates a substantial and effective disincentive for a defendant who might otherwise raise defenses bordering on the frivolous in an effort to gain a tactical advantage over a plaintiff by obtaining a transfer of a case from the Small Claims division." *Burns* v. *Bennett*, 220 Conn. 162, 169, 595 A.2d 877 (1991).

The defendant's related argument, that § 52-251a punishes defendants for exercising their right to transfer a case to the regular docket, was raised in 1973 prior to the adoption of the precursor to § 52-251a. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1973 Sess., pp. 230–31, remarks of John Ahern, counsel to the Insurance Association of Connecticut. Thus, the legislature considered and rejected the identical argument the defendant now repeats.

Another factor that supports the court's high award of attorney's fees, relative to the plaintiff's recovery, is the undesirability to Connecticut attorneys of relatively small dollar amount consumer cases such as the plaintiff's case. The plaintiff's counsel testified that he knew of only one other lawyer in the state who may have

taken the plaintiff's case. Given the social benefit of consumer protection cases, it is good public policy to encourage the prosecution of claims that, although small, are meritorious by awarding attorney's fees. As evidenced by 15 U.S.C. § 2310 (d), that policy clearly has been adopted by Congress as well.

Several other factors justify the strong message the court has sent, including the defendant's overzealous defense of this case, its failure to cite any support for its legal argument and its evasive answers to discovery requests that ultimately led to the imposition of sanctions.[14] Finally, the record reveals that several of the enumerated factors weigh in favor of the court's award of attorney's fees, including the significant time and labor spent on the case, counsel's experience and excellent reputation, and the fact that counsel's fee was contingent[15] rather than fixed. We accordingly conclude that although the court's irritation with the defendant is readily apparent, it is clear that the court's decision was founded on the law and, as such, is not a clear abuse of discretion.

The judgment is affirmed.

In this opinion DRANGINIS, J., concurred.

STOUGHTON, J., concurring. While I agree with the result reached by my colleagues, I write separately sim-

---

[14] Although General Statutes § 52-251 authorizes attorney's fees in cases transferred from the small claims session to the regular docket, it appears that the defendant's overall manner of conducting the litigation played a significant role in the amount of the fee award. The defendant's unreasonable behavior is evident in its answer, in which it stated that it lacked sufficient information on which to form a belief as to whether it was a merchant or whether the subject vehicle constituted "goods."

[15] The plaintiff paid counsel a retainer of $500, but the fee agreement stated that counsel would receive his hourly rate only on the successful completion of the plaintiff's case. Thus, counsel took a substantial risk by agreeing to represent the plaintiff.

ply to express my disagreement with the criticism of the defendant's counsel for his transfer of this novel issue from the small claims session of the Superior Court to the regular civil docket pursuant to Practice Book § 24-21. I believe that the defendant, Action Motors Corporation, an apparently innocent seller that had no knowledge of the salvage history of the vehicle at issue, was entitled to have the plaintiff, Laura Ann Krack, prove her case and had a statutory right to transfer the case to a court of record. I do not join in the criticism of the defendant or the defendant's attorney expressed by the trial court and quoted in the majority opinion. If this indeed were a relatively clear-cut case, it would be difficult to justify the fees that we have approved. Accordingly, I respectfully concur in the result.