ISAAC HERNANDEZ *v*. APPLE AUTO WHOLESALERS
OF WATERBURY, LLC, ET AL.
(SC 20481)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 52-572g (a)), "[a]ny holder in due course of a promissory note, contract or other instrument," executed by a buyer in connection with a credit transaction covering consumer goods, "shall be subject to all of the claims and defenses which the buyer has against the seller

[9] Indeed, counsel for both the plaintiff and the defendant informed this court during oral argument that they were unaware of any other case in which postjudgment, offer of compromise interest had been awarded under § 52-192a.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

arising out of the transaction . . . limited to the amount of debt then outstanding . . . provided the buyer shall have made a prior written demand on the seller with respect to the transaction.''

The plaintiff, who had purchased a motor vehicle from the defendant A Co. and entered into a retail installment contract with A Co. to finance the purchase, sought to recover damages from A Co. and the defendant W Co., the assignee of the contract, in the United States District Court for the District of Connecticut. The plaintiff alleged violations of the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and the Connecticut Unfair Trade Practices Act (§ 42-110a et seq.), and that, pursuant to § 52-572g (a), W Co. was subject to any claims or defenses that the plaintiff had against A Co. The contract contained the Federal Trade Commission (FTC) ''holder rule'' language mandated by federal law (16 C.F.R. § 433.2). Shortly after the sale was completed, A Co. assigned the contract to W Co. Immediately after taking delivery of the vehicle, the plaintiff noticed certain problems and had it inspected by an independent auto body expert, who concluded that it was not safe to operate. Before making any payments under the contract, the plaintiff returned the vehicle to A Co., and his attorney notified A Co. and W Co., by certified letter, that the plaintiff had revoked his acceptance of the vehicle and was demanding the return of his down payment and the trade-in allowance that he had received from A Co. After receiving the letter, W Co. reassigned the contract back to A Co. After commencing the present action, the plaintiff filed a motion for a default judgment against A Co. and a motion for summary judgment as to W Co., and W Co. filed a separate motion for summary judgment. Following a hearing, the United States District Court rendered a default judgment against A Co. and denied the motions for summary judgment. The District Court also determined that the resolution of the plaintiff's claims against W Co. turned on the applicability of § 52-572g (a) and its relationship with the FTC holder rule, and certified to this court the questions of when the limit on an assignee's liability, ''the amount of indebtedness then outstanding,'' is determined for purposes of applying § 52-572g; can an assignee avoid liability under § 52-572g by reassigning the promissory note, contract or other instrument back to the seller, and, if so, by what point in time must it do so to avoid liability; and, if a retail installment contract includes the FTC holder rule language, is an assignee's liability under the rule cumulative to its liability under § 52-572g. *Held*:

1. The limit on assignee liability under § 52-572g (a), which is ''the amount of indebtedness outstanding,'' is determined at the time of the buyer's written demand on the seller: a review of the legislative history of that statute made clear that the purpose of the statute was to shift the costs of seller misconduct from the consumer to the creditor, who is in the best position not only to shoulder those costs but to prevent their occurrence in the first instance by refusing to do business with unscrupulous sellers; moreover, interpreting § 52-572g (a) as limiting the extent

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

of assignee liability to the amount of indebtedness outstanding at the time of the written demand was consistent with and furthered the remedial purpose of the statute because it ensures the greatest possible recovery for the consumer.

2. An assignee can avoid liability under § 52-572g (a) by reassigning the promissory note, contract or other instrument back to the seller, so long as it is done before the buyer makes written demand on the seller: this court, relying on dictionary and statutory definitions for guidance, interpreted the phrase "any holder in due course of a promissory note, contract or other instrument," as used in § 52-572g (a), to mean any person in legal possession of the subject instrument, not a person formerly in possession of it; moreover, the fact that the statute required legal possession of the instrument for liability to attach did not mean that it required continued possession for liability to remain attached, as this court read the word "shall" in the phrase "shall be subject to" as creating a mandatory duty and the phrase "provided the buyer shall have made a prior written demand on the seller" as creating a condition precedent for the imposition of that duty such that, once written demand is made on the seller, the holder's liability attaches; furthermore, contrary to W Co.'s assertion that the statement of basis and purpose for 16 C.F.R. § 433.2 supported its position that the FTC contemplated that assignees could avoid liability by executing repurchase contracts with the seller prior to purchasing the financing agreement, thereby reimposing full liability for the seller's misconduct on the seller, it was clear that the FTC was not discussing ways in which a creditor could avoid liability to the buyer but, rather, ways in which the creditor could recoup from the seller money it was required to pay to the buyer.

3. If a retail installment contract includes the FTC holder rule language mandated by 16 C.F.R. § 433.2, the assignee's liability under the rule is cumulative to its liability under § 52-572g (a); there was nothing in the text or legislative history of either § 52-572g or 16 C.F.R. § 433.2 stating or implying that the respective remedies afforded thereunder were intended to be exclusive, and the legislative history of 16 C.F.R. § 433.2 was explicit that its remedies were not intended to be exclusive but, rather, cumulative of any remedies available to consumers under state or local law.

Argued November 16, 2020—officially released May 7, 2021*

*Procedural History*

Action to recover damages for, inter alia, the named defendant's alleged violation of the federal Truth in Lending Act, and for other relief, brought to the United

---

* May 7, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

States District Court for the District of Connecticut, where the court, *Bolden, J.*, rendered a default judgment against the named defendant, denied the plaintiff's motion for summary judgment and denied the motion for summary judgment filed by the defendant Westlake Services, LLC; thereafter, the court, *Bolden, J.*, certified certain questions of law to this court concerning the scope of the assignee liability of the defendant Westlake Services, LLC.

*Daniel S. Blinn*, with whom was *Brendan L. Mahoney*, for the appellant (plaintiff).

*Kenneth A. Votre*, for the appellee (defendant Westlake Services, LLC).

*Opinion*

KELLER, J. General Statutes § 52-572g (a) provides in relevant part that "[a]ny holder in due course of a promissory note, contract or other instrument . . . executed by a buyer in connection with a credit transaction covering consumer goods . . . shall be subject to all of the claims and defenses which the buyer has against the seller arising out of the transaction . . . limited to the amount of indebtedness then outstanding in connection with the credit transaction, provided the buyer shall have made a prior written demand on the seller with respect to the transaction." In the present case, which comes to us on certification from the United States District Court for the District of Connecticut; see General Statutes § 51-199b (d);[1] we must decide when "the amount of indebtedness then outstanding in connection with the credit transaction" is determined for purposes of limiting an assignee's liability under

[1] General Statutes § 51-199b (d) provides in relevant part: "The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

338 Conn. 803 OCTOBER, 2021 807

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

§ 52-572g. We also must decide whether an assignee can avoid liability under the statute by reassigning the promissory note, contract or other instrument back to the seller and, if so, by when must the assignee reassign it to avoid liability. Finally, we must determine whether, if a retail installment contract includes the Federal Trade Commission (FTC) "holder rule" language mandated by 16 C.F.R. § 433.2,[2] an assignee's liability under that rule is cumulative to its liability under § 52-572g. We conclude that "the amount of indebtedness then outstanding" is the amount of indebtedness outstanding at the time of the buyer's written demand on the seller and that an assignee can avoid liability under § 52-572g only if the promissory note, contract or other instrument is reassigned back to the seller prior to the buyer making such demand. We further conclude that an

---

[2] Title 16 of the 2017 edition of the Code of Federal Regulations, § 433.2, which was promulgated by the FTC in 1975 pursuant to its rule-making authority under 15 U.S.C. § 46, provides in relevant part: "In connection with any sale or lease of goods or services to consumers, in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, it is an unfair or deceptive act or practice within the meaning of section 5 of that Act for a seller, directly or indirectly, to:

"(a) Take or receive a consumer credit contract which fails to contain the following provision in at least ten point, bold face, type:

"NOTICE

"ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER. . . ."

Title 16 of the Code of Federal Regulations, § 433.2, was enacted "in response to concerns that sellers of goods and services were increasingly separating the consumer's duty to pay from the seller's duty to perform either by selling loan instruments to a third party after execution or by acting as a conduit between purchasers and third-party lenders." (Internal quotation marks omitted.) *Kilgore* v. *KeyBank, N.A.*, 718 F.3d 1052, 1056 n.3 (9th Cir. 2013). Like § 52-572g, the holder rule "preserves a consumer's right to assert the same legal claims and defenses against the assignee of a credit contract as that consumer could have asserted against the assignor." *Pierre* v. *Planet Automotive, Inc.*, 193 F. Supp. 3d 157, 174 (E.D.N.Y. 2016).

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

assignee's liability under the FTC holder rule is cumulative to its liability under § 52-572g.

The record certified by the District Court contains the following undisputed facts and procedural history.[3] In July, 2017, the plaintiff, Isaac Hernandez, purchased a 2011 Ford Taurus from the defendant Apple Auto Wholesalers of Waterbury, LLC (Apple Auto). *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, 460 F. Supp. 3d 164, 171 (D. Conn. 2020). The plaintiff paid $500 to Apple Auto as a down payment, received a trade-in allowance of $1000 for his 2003 Volkswagen Jetta, and financed $12,206.82 through a retail installment contract (contract), with interest accruing at a rate of 17.59 percent. See id. Pursuant to the contract, the plaintiff was required to pay $400.93 per month for forty-one months, beginning on September 3, 2017. Id. The total amount payable under the contract was $18,438.12. Id. The contract contained the FTC holder rule language mandated by 16 C.F.R. § 433.2. *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, Docket No. 3:17-cv-1857 (VAB), 2020 WL 2542752, *3 (D. Conn. May 18, 2020); see footnote 2 of this opinion. In connection with the sale, Apple Auto provided the plaintiff with the statutorily mandated vehicle inspection form K-208,[4] which indicated that the vehicle had passed inspection as to each of the items listed on the form. *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, supra, 460 F. Supp. 3d 171–72. Shortly after

_____

[3] In its order certifying the questions, the District Court referred this court to its decision in *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, 460 F. Supp. 3d 164 (D. Conn. 2020), for a more detailed factual background. See *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, Docket No. 3:17-cv-1857 (VAB), 2020 WL 2542752, *1 (D. Conn. May 18, 2020).

[4] Form K-208 provides in relevant part: "This report shall be used by a CT licensed dealer to comply with [General Statutes §] 14-62 (g) and must be completed in its ENTIRETY. Before offering any used motor vehicle for retail sale, the selling dealer shall complete a comprehensive safety inspection of such vehicle." (Emphasis altered.)

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

the sale was completed, Apple Auto assigned the contract to the defendant Westlake Services, LLC, doing business as Westlake Financial Services (Westlake). Id., 172.

Immediately after taking delivery of the vehicle, "the plaintiff noticed that it shook when he drove it and made noises when the brakes were applied." (Internal quotation marks omitted.) Id. The plaintiff called Apple Auto to have the vehicle serviced and sent text messages to one of Apple Auto's managers, but his calls and text messages were never returned. Id. On or about August 15, 2017, the plaintiff had the vehicle inspected by Robert Collins, an independent auto body expert and the owner of Wreck Check Assessments of Boston, LLC. Id. From a review of the vehicle's CARFAX report, Collins determined that the vehicle had been in accidents on September 12, 2014, and May 12, 2016, and that it had been sold at auction on April 19, 2017, with a disclosure by the seller of structural damage. Id. After inspecting the vehicle, Collins concluded that it was not safe to operate on public roads.[5] Id., 173. He further concluded that "[a]ny automotive profession[al] performing a simple visual inspection [could] clearly see that [the] vehicle ha[d] been wrecked and . . . repaired to a [r]epair [l]evel 4, which entails the use of only some of the available procedures, parts, and materials to provide the minimum level of repair that would be acceptable to the average consumer's untrained eye." (Internal quotation marks omitted.) Id.

On August 28, 2017, before making any payments under the contract, the plaintiff returned the vehicle to

_____

[5] Specifically, Collins determined that the vehicle had been involved in "an event that caused structural damage to the front and rear of the vehicle," that it was "unsafe due to [this] structural damage," and that it had "not been restored in a quality and workmanlike manner." (Internal quotation marks omitted.) *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, supra, 460 F. Supp. 3d 173.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

Apple Auto by leaving it in Apple Auto's parking lot. Id. On August 29, 2017, the plaintiff's attorney notified Westlake and Apple Auto by certified letter that the plaintiff had revoked acceptance of the vehicle and was demanding the return of his $500 down payment and either the 2003 Volkswagen Jetta or the $1000 trade-in allowance for it. Id. The plaintiff also asserted various claims against Apple Auto under state and federal law, which he offered to settle for $8000.

After receiving the letter, on October 13, 2017, Westlake reassigned the contract back to Apple Auto. Id. On November 3, 2017, the plaintiff commenced the underlying action against Apple Auto and Westlake in the United States District Court for the District of Connecticut, alleging violations of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., breach of the implied warranty of merchantability under the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, 15 U.S.C. § 2301 et seq., and article 2 of the Uniform Commercial Code, General Statutes § 42a-2-101 et seq., and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Id., 174. The plaintiff further alleged that, pursuant to § 52-572g, Westlake was subject to any claims or defenses that the plaintiff had against Apple Auto. Id.

On September 6, 2019, the plaintiff filed a motion for a default judgment against Apple Auto based on its failure to appear[6] and a motion for summary judgment against Westlake. Id., 176. In response, Westlake filed a motion for summary judgment against the plaintiff. Id. On April 16, 2020, the District Court held a telephonic hearing on the parties' motions for summary judgment during which the court asked the parties to brief what,

---

[6] The court granted the plaintiff's motion for a default judgment against Apple Auto on May 18, 2020, awarding the plaintiff $24,300. *Hernandez* v. *Apple Automotive Wholesalers of Waterbury, LLC*, supra, 460 F. Supp. 3d 191.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

if any, questions it should certify to this court regarding the applicability of § 52-572g to the plaintiff's claims against Westlake and the interplay between that statute and the FTC holder rule language contained in the contract between the plaintiff and Apple Auto. *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, supra, 2020 WL 2542752, *2.

On April 27, 2020, the plaintiff submitted the requested briefing, in which he argued that Westlake was liable for the plaintiff's claims under both § 52-572g and the contractual holder rule language. Id., *2, *4. The plaintiff further argued that § 52-572g does not require that an assignee of a retail installment contract be in possession of the contract for liability to attach and that, in fact, "the statutory language contemplates that there may be multiple holders, each of which may be liable for seller misconduct." (Internal quotation marks omitted.) Id., *4. The plaintiff maintained, rather, that "Westlake's liability under [§] 52-572g was triggered when [the plaintiff] made prior written demand for his claims upon Apple Auto"; id.; and that none of the issues in the present case "[was] of sufficient public importance to justify certification to [this] [c]ourt." (Internal quotation marks omitted.) Id., *5. The plaintiff therefore argued that the District Court "should simply apply the plain meaning of the statute and impose liability upon Westlake for the amount outstanding at the time that the claim arose." (Internal quotation marks omitted.) Id.

For its part, Westlake argued that the plaintiff could not recover under § 52-572g because Westlake reassigned the contract back to Apple Auto prior to the commencement of the plaintiff's action, and, therefore, Westlake was no longer a "holder in due course" as contemplated by that statute. (Internal quotation marks omitted.) Id., *4. Westlake further argued that the District Court should seek this court's guidance as to the meaning of § 52-572g because "issues of assignee liability are

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

important to both lenders and consumers throughout Connecticut, and because there are no Connecticut Appellate Court or Supreme Court decisions addressing the applicability of . . . § 52-572g to innocent lenders in Westlake's position.'' Id., *5. Westlake proposed that the District Court certify the following questions:

''1. Whether an assignee['s] liability under . . . § 52-572g, which is limited to the amount of indebtedness then outstanding in connection with the credit transaction, is determined at the time the claim arose, at the time the consumer made a prior written demand on the seller with respect to the transaction, at the time the suit commences, at the time of the judgment, or at some other time?

''2. Whether under . . . § 52-[572g] the reassignment back to the seller assignor by an assignee of a promissory note, contract, or other instrument terminates liability of the assignee and if so at what point must [the] reassignment occur to terminate liability?

''3. How are the amounts paid under the contract determined by the court when the contract contains the language mandated by 16 C.F.R [§ 433.2] . . . ?'' (Internal quotation marks omitted.) Id.

Although the plaintiff opposed certification, he agreed with Westlake's proposed questions should the District Court decide in favor of certification and recommended that the court also seek this court's guidance on whether an assignee's liability under § 52-572g and 16 C.F.R § 433.2 is cumulative or whether it is equal to the higher of the two limits specified in each of those provisions. Id.

The District Court agreed with Westlake that the issues concerning assignee liability under § 52-572g ''[were] of sufficient public importance and lack[ed] sufficient guidance from Connecticut courts . . . to

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

warrant certification of versions of the questions proposed by parties.'' Id., *6. The court noted that ''no [c]ourt of [a]ppeals, district court within the Second Circuit, or Connecticut state court has addressed whether a holder's reassignment of a loan before the filing of a lawsuit negates that holder's liability under the [FTC] [h]older [r]ule or under any state assignee liability laws. . . . And no court has addressed the relationship between the FTC [h]older [r]ule and . . . § 52-572g.'' Id., *4. The court further noted that ''the questions of assignee liability raised here will not only be determinative of liability in this case but will also have implications for lender liability in consumer cases brought against sellers and lenders across [Connecticut]. . . . The issue is of equal importance to consumers, who frequently seek remedies against both the seller, based on breach of contract or unfair trade practices, and the creditor, based on assignee liability.'' (Citation omitted.) Id., *6. The District Court therefore certified the following questions to this court, which are ''based on the parties' proposed questions and the [District] Court's own analysis:

''1. When is the limit on assignee liability, 'the amount of indebtedness then outstanding,' determined under . . . § 52-572g?

''2. Can an assignee avoid liability under . . . § 52-572g by [reassigning] the promissory note, contract or other instrument back to the seller? If so, by when must the assignee reassign the loan to avoid liability?

''3. If a retail installment contract includes the language mandated by 16 C.F.R. § [433.2], the FTC [h]older [r]ule, is the assignee liability under this incorporated contractual language cumulative to the statutory liability under . . . § 52-572g?'' Id., *6–7.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

I

We begin with the question of when the limit on assignee liability ("the amount of indebtedness then outstanding") is determined for purposes of applying § 52-572g. The plaintiff contends that that determination must be made when the buyer makes written demand on the seller because the phrase "then outstanding" requires that liability be fixed at a particular point in time, and the only point in time referenced in the statute is the time of the buyer's "prior written demand [on] the seller." The plaintiff further argues that, as a remedial statute, § 52-572g must be liberally construed in favor of those whom it was intended to benefit, and, "[s]ince the amount of indebtedness outstanding will decrease over time as payments are made by a debtor, it benefits consumers to set the 'amount of indebtedness' at an earlier point in time." Westlake disagrees. In its view, "the only practical time" to determine the limit on an assignee's liability is at the time of judgment or perhaps "at the time of trial" because the amount of indebtedness may increase or decrease after written demand is made on the seller depending on the actions of the debtor.[7] We agree with the plaintiff that "the amount of indebtedness then outstanding" is the amount of

―――――――――――

[7] Rather than address the questions certified to us by the District Court, Westlake's primary contention, in response to each of those questions, is that the FTC holder rule "occupies the field" in this area such that its limit on assignee liability (the amount paid by the debtor under the contract) preempts the limit set by § 52-572g. Specifically, Westlake argues that "the [FTC] [h]older [r]ule effectively occupies the field and preempts . . . § 52-572g. Only the [h]older [r]ule is applicable, and, therefore, the only damages payable to the plaintiff are limited to those that were actually paid on the [contract]. That sum can only be finally determined at trial." The plaintiff understandably objects to this line of argument as outside the scope of the certified questions. The plaintiff further contends, and we agree, that the District Court is perfectly well situated to decide questions of federal preemption and would not have sought this court's guidance as to the meaning of § 52-572g if it believed that the statute was preempted by 16 C.F.R. § 433.2. It would have simply applied 16 C.F.R. § 433.2.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

indebtedness outstanding at the time of the buyer's written demand on the seller.

When the "the amount of indebtedness then outstanding" is determined for purposes of applying § 52-572g presents a question of statutory interpretation. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Fedus* v. *Planning & Zoning Commission*, 278 Conn. 751, 756, 900 A.2d 1 (2006). It is axiomatic that "remedial statutes should be construed liberally in favor of those whom the law is intended to protect . . . ." (Citation omitted; internal quotation marks omitted.) *Fairchild Heights, Inc.* v. *Dickal*, 305 Conn. 488, 502, 45 A.3d 627 (2012).

Section 52-572g (a) provides in relevant part that "[a]ny holder in due course of a promissory note, contract or other instrument . . . evidencing an indebtedness, signed or executed by a buyer in connection with a credit transaction covering consumer goods . . . shall be subject to all of the claims and defenses which the buyer has against the seller arising out of the transaction . . . limited to the amount of indebtedness then outstanding in connection with the credit transaction,

816 OCTOBER, 2021 338 Conn. 803

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

provided the buyer shall have made a prior written demand on the seller with respect to the transaction.'' Thus, while the phrase ''then outstanding'' indicates that the ''amount of indebtedness'' is to be determined at a particular point in time, the statute does not specify when that time is. Because there are at least three reasonable possibilities—at the time of the prior written demand, at the commencement of an action, or at the time of judgment—the statute is ambiguous as to when the amount of indebtedness becomes fixed for purposes of setting a cap on an assignee's liability under the statute. It is necessary, therefore, to consult the legislative history and circumstances surrounding the statute's enactment for interpretative guidance. A review of those source materials persuades us that the amount of indebtedness then outstanding is determined at the time of the buyer's written demand on the seller.

The legislative history reveals that, prior to its passage, the Public Act that would later become § 52-572g (a); Public Acts 1972, No. 137; enjoyed near universal support in both the House of Representatives and the Senate. See, e.g., 15 S. Proc., Pt. 2, 1972 Sess., p. 638, remarks of Senator William E. Strada, Jr. (noting Senate's unanimous passage of bill at end of prior legislative session); 15 H.R. Proc., Pt. 5, 1972 Sess., p. 1963, remarks of Representative Albert R. Webber (noting bill's widespread acceptance and support). The legislative history further indicates that the statute was intended to abolish what one legislator described as ''one of the most vicious of all consumer credit traps,'' the holder in due course doctrine.[8] 15 H.R. Proc., supra, pp. 1972–73,

_____

[8] Under the holder in due course doctrine, as it was applied in many jurisdictions at the time of the enactment of § 52-572g, ''if a seller sold goods on credit and transferred the credit contract to a lender, the lender could enforce the buyer's promise to pay even if the seller failed to perform its obligations under the sales contract. Similarly, despite a seller's breach, the buyer was obligated to pay the lender under a consumer loan contract that directly financed the purchase of goods or services from the seller.'' (Internal quotation marks omitted.) *Lafferty* v. *Wells Fargo Bank, N.A.*, 25 Cal. App.

338 Conn. 803     OCTOBER, 2021     817

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

remarks of Representative Howard Newman. For those members who were unfamiliar with that doctrine, Representative Newman explained that it generally arose when a consumer finances the purchase of goods or services through a retail installment contract or other instrument arranged by the seller, which is later assigned to a bank or other finance company. Id., p. 1973. "If the product turns out to be a lemon, is damaged or needs servicing under a warranty and the seller refuses to take whatever action is indicated, the finance company or bank has no responsibility to make good [on the contract]. If the buyer refuses to make payments

_____

5th 398, 411, 235 Cal. Rptr. 3d 842 (2018), review denied, Docket No. S250794, 2018 Cal. LEXIS 8573 (Cal. October 31, 2018), cert. denied,     U.S.     , 139 S. Ct. 1456, 203 L. Ed. 2d 682 (2019). In other words, an assignee "could assert his right to be paid by the consumer despite misrepresentation, breach of warranty or contract, or even fraud on the part of the seller, and despite the fact that the consumer's debt was generated by the sale." (Internal quotation marks omitted.) Id. In Connecticut, however, an assignee of a consumer credit contract, even before the enactment of § 52-572g, "[stood] in the shoes of its assignor . . . and [had] no greater rights of recovery in [an] action [against the consumer] than [the assignor] . . . ." *Fairfield Credit Corp.* v. *Donnelly*, 158 Conn. 543, 552, 264 A.2d 547 (1969). Thus, in *Fairfield Credit Corp.*, this court rejected a claim by the holder of a retail installment contract that it was a "holder in due course" for purposes of enforcing the contract Id., 549. The contract in question contained a "waiver of defense clause," which stated that "[t]he [b]uyer . . . will not assert or use as a defense any . . . claim [it might have against the seller] against the assignee." (Internal quotation marks omitted.) Id., 548. Characterizing that clause as "an attempt to impart the attributes of negotiability to an otherwise nonnegotiable instrument"; id., 550; and "to give [an] assignee [of the contract] the status of a holder in due course of a negotiable instrument"; id., 549; this court held the clause unenforceable as against public policy. Id., 551. In so doing, the court stated: "There can be no question that there exists in Connecticut a very strong public policy in favor of protecting purchasers of consumer goods and that for a court to enforce a waiver of defense clause in a consumer-goods transaction would be contrary to that policy." Id. The court further stated that, "since Connecticut's adoption of the Uniform Commercial Code in 1959, it has become increasingly clear that the policy of our state is to protect purchasers of consumer goods from the impositions of overreaching sellers." Id., 550–51; see id. (citing various consumer protection statutes enacted following state's adoption of Uniform Commercial Code).

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

as they [become] due, the [finance company] may repossess the . . . goods or the buyer may be dunned for the entire balance of the loan, payable immediately.'' Id. In other words, ''[t]he bank or finance company doesn't have to do anything about your defective appliance . . . but you have to continue to pay [for it].'' Id., p. 1975, remarks of Representative Earl T. Holdsworth; see also id., p. 1965, remarks of Representative Rosario T. Vella (noting that holder in due course doctrine ''deprives the consumer of his only effective bargaining tool when goods or services are defective,'' which is nonpayment); id., p. 1963, remarks of Representative Webber (''I know of no official . . . and no legal authority in the [n]ation who is familiar with the doctrine of holder in due course who does not favor its abolition. If there is one outrage against the common decencies of the marketplace this doctrine is it.'').

Representative Webber explained that the bill would subject assignees of consumer credit contracts to all the claims and defenses that the consumer would have against the seller. Id., p. 1963. In this way, he explained, it would force ''banks, finance companies and other buyers of installment [contracts] to police the companies [they do business with]. And if a retail seller has a record of poor performance [or history of selling] defective products and services, the buyer of paper will stay away from him. And this is all for the good. Such firms should be driven out of the avenues of commerce.'' Id.; see also 15 S. Proc., supra, p. 639, remarks of Senator Strada (''[T]his is a rather tough consumer [protection] bill'' intended to put ''the burden . . . on the banks because now banks will actually have to police the market. If they buy a note from a company that is not reputable, they do so at their [own] risk . . . .''); 15 H.R. Proc., supra, p. 1975, remarks of Representative Holdsworth (''This bill simply [makes] the bank or the finance company . . . liable for the same

338 Conn. 803 OCTOBER, 2021 819

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

claims and defenses as the original seller [would] be. It is very little to ask of a financing firm, especially in [a] field where the rate of return is one of the highest in [the] entire country. This is a fair bill . . . [that is] long overdue . . . .'').

Although there was much commentary in both the House of Representatives and the Senate explaining the origins of the bill and extolling its virtues, the only discussion bearing directly on the question before us occurred when Representative Francis J. Collins voiced concern over language in the bill conditioning a consumer's right of recovery on the consumer's having first made a written demand on the seller. See 15 H.R. Proc., supra, p.1970, remarks of Representative Collins. Specifically, Representative Collins stated: ''Perhaps the gentleman could shed some light on . . . the words . . . 'provided the buyer shall have made a prior written demand on the seller with respect to such transaction.' Would the gentleman tell us . . . what kind of a demand other than a written demand and what is the demand for?'' Id. Representative Webber responded that it was ''merely a written notice to the seller pointing out the complaint before [legal] action is taken [against the creditor]. This was the way we were able to get the bill out [of committee]. I think it is a very minor thing.'' Id. Representative Vella further responded that ''*the demand would be in writing* [*and*] *would be limited to the amount of indebtedness then outstanding in connection with* [*the*] *credit transaction*.'' (Emphasis added.) Id., pp. 1970–71.

In the Senate, Senator Edward S. Rimer, Jr., expressed similar concern over the prior written demand requirement and asked the bill's sponsor, Senator Strada, to clarify, for purposes of ''legislative intent,'' that the bill did not require the consumer ''to institute legal action'' against the seller prior to bringing an action against the creditor. 15 S. Proc., supra, pp. 641–42. Senator Strada

responded that it did not, explaining in relevant part: "What we are attempting to do here is to discourage . . . frivolous lawsuits [against the creditors] [be]cause this is a tremendous burden upon the banks, as I stated previously, and we think that it is only fair there should be some starting point, and the starting point would be a written demand [on] the [seller] and we are hopeful . . . that if it is a reputable retailer and the goods [are] defective, there can be a reconciliation worked out [between buyer and seller] and it will not reach the point of the [buyer suing] the bank, but certainly for legislative intent [it does] not mean that a lawsuit must be instituted [against the seller]." Id., p. 642.

Thus, to the extent the legislative history sheds any light on when "the amount of indebtedness then outstanding" is determined for purposes of calculating an assignee's maximum liability under § 52-572g (a), it indicates that it is the amount of indebtedness outstanding when the written demand is made on the seller. This is evident not only in Representative's Vella's response to Representative Collins—that the demand on the seller will be for the amount of the outstanding indebtedness; see 15 H.R. Proc., supra, pp. 1970–71; but also in the statement of Senator Strada that the demand letter is "the starting point" for an action against the creditor and largely a formality, albeit one that was deemed necessary to move the bill out of committee. 15 S. Proc., supra, p. 642.

Interpreting § 52-572g (a) as limiting the extent of assignee liability to the amount of indebtedness at the time of the written demand on the seller is consistent with and furthers the remedial purpose of the statute because it ensures the maximal recovery for the consumer. This is so because, if a consumer who continues to make payments under the contract during the pendency of the action ultimately prevails against the creditor, the consumer's potential recovery would be

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

inadequate under Westlake's proposed construction, which would limit the creditor's liability to the amount of indebtedness outstanding at the time of judgment. Because the legislative history makes clear that the purpose of the statute is to shift the costs of seller misconduct from the consumer to the creditor, who is in the best position not only to shoulder them but to prevent their occurrence in the first instance by refusing to do business with unscrupulous sellers, we conclude that "the amount of indebtedness then outstanding" under § 52-572g (a) is the amount of indebtedness outstanding when the buyer makes written demand on the seller.

II

We turn next to the question of whether an assignee can avoid liability under § 52-572g by reassigning the promissory note, contract or other instrument back to the seller and, if so, by when must the assignee do so to avoid liability. Although Westlake asserts that an assignee can avoid liability by reassigning the note "any time before judgment," it does not explain why this contention makes sense of § 52-572g as a textual matter or in light the statute's remedial purpose and legislative history. Instead, Westlake argues that interpreting § 52-572g to permit an assignee to avoid liability in this manner is consistent with the overarching purpose of 16 C.F.R. § 433.2, which, according to Westlake, is to prevent the separation of the seller's duty to perform from the consumer's duty to pay.

The plaintiff responds, inter alia, that neither § 52-572g nor its federal counterpart, 16 C.F.R. § 433.2, conditions liability on an assignee being in possession of the promissory note, contract or other instrument at the time of judgment—or at any other time for that matter—but, rather, imposes liability on "any holder" at any time, past or present. The plaintiff argues that,

if the legislature had wanted to limit liability under § 52-572g to present holders, it easily could have done so simply by using the phrase "the current holder" or even just "the holder," both of which convey a present temporal sense. To conclude otherwise, the plaintiff contends, would undermine the statute's remedial purpose of holding creditors liable for the misdeeds of sellers because it would allow a creditor, at the first sign of trouble, to avoid liability simply by reassigning the promissory note, contract or other instrument back to the seller. At a minimum, the plaintiff argues, an assignee cannot escape liability after the written demand is made on the seller because the statute's language and legislative history make clear that the written demand is what triggers the assignee's liability under the statute. We conclude that an assignee's liability under § 52-572g attaches at the time the buyer makes the required written demand on the seller, after which time the assignee cannot avoid liability by reassigning the promissory note, contract or other instrument back to the seller.

Whether an assignee can avoid liability under § 52-572g by reassigning a promissory note, contract or other instrument back to the seller and, if so, by when must the reassignment occur for liability to be avoided presents a question of statutory interpretation that is governed by the well established principles of statutory construction set forth in part I of this opinion. In applying these principles, we continue to be mindful that § 52-572g, as a remedial statute, "must be afforded a liberal construction in favor of those whom the legislature intended to benefit . . . ." (Citation omitted; internal quotation marks omitted.) *Dorry* v. *Garden*, 313 Conn. 516, 530, 98 A.3d 55 (2014).

As previously stated, § 52-572g (a) provides in relevant part that "[a]ny holder in due course of a promissory note, contract or other instrument" executed by a

buyer in connection with a consumer credit transaction "shall be subject to all of the claims and defenses which the buyer has against the seller arising out of the transaction . . . provided the buyer shall have made a prior written demand on the seller with respect to the transaction." Although it is true, as the plaintiff argues, "[t]he word 'any' has a diversity of meanings and may be employed to indicate 'all' or 'every' as well as 'some' or 'one' "; *Muller* v. *Town Plan & Zoning Commission*, 145 Conn. 325, 328, 142 A.2d 524 (1958); the word "holder" does not. It has a decidedly singular meaning in the law: "[s]omeone who has legal possession of a negotiable instrument and is entitled to receive payment on it." Blacks Law Dictionary (11th Ed. 2019), p. 879; see also General Statutes § 42a-1-201 (21) (A) (defining "[h]older" as "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession"). To establish "holder in due course" status, a holder must also prove that his taking of the instrument was for value, in good faith, and "without notice that it [was] overdue or has been dishonored or of any defense against or claim to it on the part of any person. General Statutes § 42a-3-302 . . . ." (Citations omitted; internal quotation marks omitted.) *Funding Consultants, Inc.* v. *Aetna Casualty & Surety Co.*, 187 Conn. 637, 640–41, 447 A.2d 1163 (1982); see also *Cadle Co.* v. *Errato*, 71 Conn. App. 447, 458, 802 A.2d 887 (plaintiff must prove that it is in possession of promissory note to establish holder in due course status), cert. denied, 262 Conn. 918, 812 A.2d 861 (2002). Given these definitions, it is apparent that the phrase "any holder in due course of a promissory note, contract or other instrument," as used in § 52-572g (a) can only mean any person in legal possession of the instrument, not a person formerly in possession of it.

Our inquiry does not end there, however. The fact that § 52-572g (a) requires legal possession of the prom-

issory note, contract or other instrument for liability to attach does not mean that it requires continued possession of it for liability to remain attached. The statute provides that the holder "*shall be subject to all of the claims and defenses which the buyer has against the seller arising out of the transaction . . . provided the buyer shall have made a prior written demand on the seller with respect to the transaction.*" (Emphasis added.) General Statutes § 52-572g (a). We read the word "shall" in the phrase "shall be subject to" as creating a mandatory duty and the phrase "provided the buyer shall have made a prior written demand on the seller" as creating a condition precedent for the imposition of that duty such that, once written demand is made on the seller, the holder's liability attaches. General Statutes § 52-572g (a).

We can perceive no reason, and Westlake has identified none, why the legislature would have intended any other result, particularly a result that would allow an assignee to evade liability simply by reassigning the instrument back to the seller as soon as written demand is made on the seller, as in the present case. Instead, we agree with the California Court of Appeals' recent analysis of this issue as applied to 16 C.F.R. § 433.2: "[The defendant] cites to no legal authority, and we found none, excusing a holder from liability simply because it reassigned the debt instrument to someone else before judgment was entered in the consumer's case. . . .

"[The defendant] maintains there was nothing in the car financing documents of a personal nature to preclude its assignment. Perhaps this is true, but it does not answer the issue at hand. The question is not whether the finance documents could . . . be [reassigned]. The question is whether a creditor-assignee can avoid liability under the [h]older [r]ule by [reassigning]

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

after the misconduct has occurred, [or] the lawsuit has been filed, [or] it has been named a defendant.

"[The defendant] does not suggest what policy or purpose would be served by giving a creditor-assignee such an easy exit strategy. The notice provides any holder is subject to all claims and defenses the consumer has against the original seller. Therefore, any effort by an . . . assignee to play hot potato with a consumer credit contract will not be effective. . . .

"The [purpose of 16 C.F.R. § 433.2 is to take] away the [financer's] traditional status as a holder in due course and [to subject] it to any potential claims and defenses the purchaser has against the seller. Based on a simple public policy determination, as between an innocent consumer and a third party financer, the latter is generally in a vastly superior position to: (1) return the cost to the seller, where it properly belongs; (2) exert an influence over the behavior of the seller in the first place; and (3) to the extent the financer cannot return the cost (as in the case of fly-by-night dealers), internalize the cost by spreading it among all consumers as an increase in the price of credit. Knowing that it bears the cost of seller misconduct, the creditor will simply not accept the risks generated by the truly unscrupulous merchant. The market will be policed in this fashion and all parties will benefit accordingly." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Duran* v. *Quantum Auto Sales, Inc.*, Docket No. G052968, 2017 WL 6333871, *15–16 (Cal. App. December 12, 2017); see also *Associates Home Equity Services, Inc.* v. *Troup*, 343 N.J. Super. 254, 277, 778 A.2d 529 (App. Div. 2001) ("[The lender], as a potential holder had notice that if it procured the purchase money loan arranged by [the seller], it may be stepping into [the seller's] shoes. We cannot accept the proposition that the FTC contemplated that such result would not attach simply because of a subsequent

assignment of the loan, especially when, as here, it is claimed that [the lender] actively participated with . . . the seller . . . in placing the loan with the [the buyers].'' (Internal quotation marks omitted.)).

Westlake asserts, nevertheless, that the "Statement of Basis and Purpose'' for 16 C.F.R. § 433.2 supports the view that the FTC contemplated that assignees could avoid liability by executing "repurchase'' contracts with the seller prior to purchasing the financing agreement, thereby reimposing the full liability for the seller's misconduct on the seller. We disagree. In the section of the statement to which Westlake is referring, the FTC explains that, "[a]s a practical matter, the creditor is always in a better position than the buyer to return seller misconduct costs to sellers, the guilty party. This is the reallocation desired, a return of costs to the party who generates them. The creditor financing the transaction is in a better position to do this than the consumer, because (1) he engages in many transactions where consumers deal infrequently; (2) he has access to a variety of information systems which are unavailable to consumers; (3) he has recourse to contractual devices which render the routine return of seller misconduct costs to the sellers relatively cheap and automatic; and (4) the creditor possesses the means to initiate a lawsuit and prosecute it to judgment where recourse to the legal system is necessary.'' Preservation of Consumers' Claims and Defenses, 40 Fed. Reg. 53,506, 53,523 (November 18, 1975).

One of the contractual devices available to creditors, the FTC notes, is a " 'reserve' or 'recourse' arrangement or account with the seller for reimbursement.'' Id. "In cases [in which] 'repurchase' or 'reserve' contracts, or other recourse devices available to creditors, facilitate the return of an account to a seller . . . the creditor will compel the seller to carry the costs so occasioned.'' Id. It is clear, however, that the FTC is not discussing

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

in this section ways in which a creditor can avoid liability to the buyer but, rather, ways in which the creditor can recoup *from the seller* money it was required to pay to the buyer. The operative word in this section is "reimbursement." The costs for which the creditor is being "reimbursed," whether through a repurchase or reserve contract with the seller, are the costs the creditor incurred when it was forced, by operation of the FTC holder rule, to stand in the seller's shoes and to compensate the buyer for the seller's misconduct.

III

Finally, we turn to the question of whether, if a retail installment contract includes the FTC holder rule language mandated by 16 C.F.R. § 433.2, the assignee liability under this incorporated contractual language is cumulative to the statutory liability under § 52-572g. The plaintiff argues that the assignee liability is cumulative because the FTC commentary to 16 C.F.R. § 433.2 "explicitly contemplated the existence of state remedies such as 52-572g and expressed the . . . view that the holder rule remedy was not intended as a limitation on [those] remedies . . . ." The plaintiff further argues that the legislature was aware, when it enacted § 52-572g, that the FTC was in the process of promulgating 16 C.F.R. § 433.2, which, like § 52-572g, would abolish the holder in due course doctrine in consumer credit transactions, and, rather than wait for the FTC to act, the legislature chose to act independently. The plaintiff also notes that § 52-572g has been amended three times since the enactment of 16 C.F.R. § 433.2, but not once has the legislature seen fit to conform the remedy available thereunder to the remedy available under 16 C.F.R. § 433.2. Finally, the plaintiff argues that, in *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 652 A.2d 496 (1995), this court held that remedies available under two separate statutory schemes addressing the same abusive car dealer practice were cumulative; see id.,

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

711, 724; and that the reasoning we applied in *Jacobs* is fully applicable to the present case. Westlake responds that 16 C.F.R. § 433.2 preempts § 52-572g, and, therefore, the only remedy available to the plaintiff is the remedy available under the holder rule notice contained in the plaintiff's contract with Apple Auto.

We agree with the plaintiff that the answer to the third certified question is informed by our decision in *Jacobs* v. *Healey Ford-Subaru, Inc.*, supra, 231 Conn. 707. In *Jacobs*, the issue before the court was "whether [a car dealer], who has violated General Statutes [(Rev. to 1989)] § 42-98 [now § 36a-785] of the Retail Instalment Sales Financing Act (RISFA) and General Statutes [(Rev. to 1989)] § 42a-9-504 [now § 42a-9-610] of the Uniform Commercial Code (UCC) [by unlawfully repossessing a vehicle], must pay damages under each statute to the injured plaintiff." (Footnotes omitted.) Id., 708– 10. We concluded that, "because the remedies [were] not explicitly exclusive, there [was] no conflict between the two provisions," and, therefore, "both must be given concurrent effect . . . ." Id., 710–11.

In reaching our determination, we rejected the defendant's contention that a conflict existed "solely because the provisions of RISFA and the UCC include different and distinct remedies."[9] Id., 719. We concluded, rather, that, "[a]lthough the remedy provisions of RISFA and the UCC provide different relief, we are persuaded that both can apply simultaneously. Mindful that consumer

---

[9] As we explained in *Jacobs*, in the event of an unlawful repossession, "RISFA provides a statutory formula that allows the retail buyer to recover 'his actual damages, if any, and in no event less than one-fourth of the sum of all payments which have been made under the contract.' General Statutes [(Rev. to 1989)] § 42-98 (i) [now § 36a-785 (i)]. The UCC allows the debtor to recover 'an amount not less than the credit service charge plus [10 percent] of the principal amount of the debt or the time price differential plus [10 percent] of the cash price.' General Statutes [(Rev. to 1989)] § 42a-9-507 (1) [now § 42a-9-625 (2)]." *Jacobs* v. *Healey Ford-Subaru, Inc.*, supra, 231 Conn. 719.

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

legislation must be interpreted so as to implement its remedial purpose of protecting consumer buyers; *Mack Financial Corp.* v. *Crossley*, 209 Conn. 163, 166, 550 A.2d 303 (1988); *Barco Auto Leasing Corp.* v. *House*, 202 Conn. 106, 116, 520 A.2d 162 (1987); and in accord with the reasoning other jurisdictions have applied to resolve this issue, we conclude[d] that there [was] no conflict between the remedy provisions of RISFA and the UCC, in the absence of a clear mandate that the remedies [were] exclusive.'' *Jacobs* v. *Healey Ford-Subaru, Inc.*, supra, 231 Conn. 722.

In reaching our determination in *Jacobs*, we also explained that our holding was consistent with the public policy behind the two statutes, which was ''to protect the consumer from well documented repossession abuses and to encourage and promote compliance with the laws that govern such actions.'' Id. Noting that ''[t]he award of damages [under RISFA] is too minimal to provide a 'stimulus to make it advantageous for the seller to follow [RISFA]' ''; id., 723; we agreed with the view that ''the drafters created a statutory penalty in [U.C.C. §] 9-507 [now § 9-625] to 'up the ante for those who would abuse the consumer' ''; id., 724; and that it was ''irrelevant that [that] penalty [bore] little or no relation to the actual loss.'' Id.

The same reasoning applies in the present case. There is nothing in the text or legislative history of § 52-572g or 16 C.F.R. § 433.2 stating or implying that the respective remedies afforded thereunder were intended to be exclusive. Indeed, as previously discussed, the legislative history of 16 C.F.R. § 433.2 is explicit that its remedies are *not* intended to be exclusive but, rather, cumulative of any remedies available to the consumer under state or local law. Whereas 16 C.F.R. § 433.2 limits recovery to money actually paid under the contract, including any down payment; see Guidelines on Trade Regulation Rule Concerning Preservation of Consum-

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

ers' Claims and Defenses, 41 Fed. Reg. 20,022, 20,023 (May 14, 1976); § 52-572g limits the consumer's recovery to the amount of indebtedness then outstanding. This means that, in cases such as the present one, in which the consumer has made no payments under the contract, the consumer's recovery may be greater than his or her actual losses. Given the legislative history of § 52-572g, there can be little doubt that this is what the legislature intended and deemed necessary to incentivize creditors to rid the marketplace of disreputable merchants. See, e.g., 15 S. Proc., supra, p. 639, remarks of Senator Strada (explaining that bill places "the burden . . . on the banks because now banks will actually have to police the market" and that, "[i]f they buy a note from a company that is not reputable, they do so at their [own] risk"); 15 H.R. Proc., supra, p. 1963, Remarks of Representative Webber ("whoever profits from a retail sales contract should also be required to stand behind the product and service"). When, however, the remaining indebtedness is less than the money paid under the contract, 16 C.F.R. § 433.2 ensures that the consumer will be able to recover an amount that is closer to the amount of his or her actual damages. In this way, the two provisions work in tandem to ensure the maximum recovery for the consumers whom they were intended to protect. For these reasons, we conclude that 16 C.F.R. § 433.2 and § 52-572g must be given concurrent effect and that the remedies awarded under them are cumulative.

The answer to the first certified question is that the limit on assignee liability under § 52-572g (a), which is "the amount of indebtedness then outstanding," is determined at the time of the written demand on the seller.

The answer to the second certified question is that an assignee can avoid liability under § 52-572g by reassigning the promissory note, contract or other instru-

Hernandez *v.* Apple Auto Wholesalers of Waterbury, LLC

ment back to the seller, so long as it is done before the buyer makes written demand on the seller.

The answer to the third certified question is that, if a retail installment contract includes the FTC holder rule language mandated by 16 C.F.R. § 433.2, the assignee's liability under that rule is cumulative to its liability under § 52-572g.

No costs shall be taxed in this case to any party.

In this opinion the other justices concurred.